F I L E D
Clerk
District Court

APR 24 2015

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

KAYE CHRISTIAN,

    Plaintiff,

    v.

COMMONWEALTH OF THE
NORTHERN MARIANA ISLANDS,
COMMONWEALTH HEALTHCARE
CORP., EUSEBIO MANGLONA, DR.
FRANCOIS CLAASSENS, ESTHER L.
MUNA, JAMES C. DELEON
GUERRERO, and DOES 1–10,

    Defendants.

Case No. 1:14-CV-00010

**DECISION AND ORDER**

## I.   INTRODUCTION

In her First Amended Complaint, Plaintiff Kaye Christian seeks injunctive and monetary relief against the Defendants[1] for allegedly taking her from her home and holding her captive for approximately four days in Commonwealth hospitals. (ECF No. 10.) The Defendants ask the Court to dismiss most of the Complaint pursuant to Federal Rule of Civil Procedure 12(b). (*See* Claassens' Mot. to Dismiss, ECF No. 13; Commonwealth, CHC, and all other "official capacity" defendants' Mot. to Dismiss, ECF No. 14; Eusebio Manglona's Mot. to Dismiss, ECF No. 15.)

---

[1] The Defendants are: the Commonwealth of the Northern Mariana Islands ("Commonwealth" or "CNMI"); Commonwealth Healthcare Corporation ("CHC"); Dr. Francois Claassens, a physician employed by CHC or the Commonwealth; Eusebio Manglona, a police officer with the Department of Public Safety ("DPS"); Esther L. Muna, the CEO of CHC; James C. Deleon Guerrero, the Commissioner of DPS; and Does 1-10, employees of the Commonwealth, CHC, or DPS. (Compl. ¶¶ 6–13.)

The Court heard arguments on October 2, 2014, and requested further briefing from both parties. (*See* Min. Entry, Oct. 2, 2014, ECF No. 24.) Having now received the supplemental briefs, and having considered the arguments presented by the parties in all the materials filed, as well as during the hearing, the Court will grant the Defendants' motions in part and deny them in part. The Court will dismiss the following causes of action without prejudice: Count 1 to the extent it raises a claim of excessive force; Count 2; Count 3 for the claim based on physical restraint; Counts 4 through 6; Counts 9 through 11; Count 12 as it pertains to Claassens; and Count 13. Claassens will be dismissed with prejudice from Count 7. Manglona, Claassens, and Does 1–10 will be dismissed in their individual capacities from Count 8 with prejudice. To the extent that Count 8 asserts claims under Article I, section 5 of the Commonwealth Constitution, the Court will dismiss it with prejudice. The surviving claims will be: Count 1 for false arrest; Count 3 for chemical restraint; Count 7 against the Commonwealth and CHC; Count 8 against the Commonwealth, CHC, and Manglona, Claassens, and Does 1–10 in their official capacities; and Count 12 against the Commonwealth, CHC, and Does 1–10. The Court will grant leave for Christian to amend any claim dismissed without prejudice, consistent with this order.

Defendants also move the Court to order Christian to provide a more definite statement. (ECF No. 15.) The Court will grant the motion and order Christian to amend the pleadings.

## II.    FACTS

At this pre-answer stage of the litigation, the Court assumes the truth of Christian's allegations as retold in this section, sans legal conclusions. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

### a.   Involuntary Commitment, 2011

Days before Christmas in 2011, Kaye Christian, who suffers from a mental illness, was

involuntarily committed at the Rota Health Center. (Compl. ¶¶ 5, 16, 51.) During the three days she spent in custody, Christian was handcuffed and left alone for hours at a time without bathroom privileges. (*Id.* ¶ 51.) Her mistreatment led to a lawsuit, and then a settlement agreement, which she attached as Exhibit A to the Complaint.[2] (*Id.* ¶ 53.)

The agreement contained six terms, mostly prospective in nature, aimed at alleviating Christian's "concern[] that neither she nor anyone else is ever again [mis]treated" at the Rota Health Center. (Settlement Agreement, Recital F, ECF No. 10-1.) Under those terms, the Commonwealth and CHC were required to "ensure that all employees and agents of the Rota Health Center and the Rota Department of Public Safety" receive compliance training with the Commonwealth's Involuntary Civil Commitment Act and Patient's Rights Act. (*Id.* § 2, ¶ 1.) The Commonwealth and CHC also agreed to ongoing training for all employees "who have direct patient contact" in the safe use of seclusion and non-violent restraint, as well as conflict management. (*Id.* ¶ 2.) Physical and chemical restraints were not to be used unless necessitated by emergency, and in no event would handcuffs be used on mentally ill patients; instead, Rota Health Center would "procure and implement the use of humane restraints" within 60 days of the agreement. (*Id.* ¶¶ 3–4.) Finally, a patient would have the right to "formulate advance directives" that would bind "hospital staff and practitioners" at Rota Health Center, including the right to have a person of his choosing promptly notified of his admission to the hospital. (*Id.* ¶¶ 5–6.)

The settlement agreement was signed in December 2012 and January 2013. (*Id.* ¶ 7.) A year later, Christian was given the opportunity to observe its effects.

### b.   *Involuntary Commitment, 2013–2014*

---

[2] The Court can consider the attached agreement for purposes of the Defendants' motions to dismiss. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

Early in the afternoon on New Year's Eve 2013, police officers, including Defendant Officer Eusebio Manglona, called on Kaye Christian at her Rota home to "talk." (Compl. ¶¶ 10, 15.) Christian agreed, but not before barricading the stairs to her home with a table. (*Id.* ¶¶ 17–18.) It did no good; explaining that "the doctor" ordered that Christian be taken in, Manglona went up the stairs, pushed aside the table, grabbed Christian's arm, twisted it up behind her, and carried her down the stairs. (*Id.* ¶¶ 19–25.) When Christian demanded to see papers or a medical referral, the officers stated that they did not have any. (*Id.* ¶¶ 21–22.) They then handcuffed Christian to a stretcher and transported her to the Rota Health Center. (*Id.* ¶¶ 25, 28.) Her protests fell on deaf ears. (*Id.* ¶ 29.)

After reaching the clinic, the officers handcuffed Christian to a bed. (*Id.* ¶ 30.) No one explained her rights or the reason for her detention and she was not allowed to make a phone call. (*Id.* ¶ 40–41, 49.) Dr. Claassens appeared and ordered Manglona and Does 1–10 to restrain Christian while he administered three successive injections. (*Id.* ¶¶ 31–36.) The drugs took effect; Christian fell into unconsciousness. (*Id.* ¶ 37.)

The next day, Claassens and Does 1–10 flew Christian from Rota to the psychiatric ward at CHC on Saipan. (*Id.* ¶ 44.) No one explained what Christian's rights were or allowed her to make a phone call. (*Id.* ¶¶ 46–47, 50.) For two more days, she was forbidden from using her cell phone, computer, backpack, or personal clothes. (*Id.* ¶¶ 48, 45.) Then, on January 3, 2014, CHC released her. (*Id.* ¶ 45.)

### III.   CLAIMS

Christian asserts 13 causes of action, each against multiple defendants in official and individual capacities, for relief ranging from declaratory and injunctive relief to compensatory and punitive damages. The first six counts are based on federal law, and Counts 7–13 are based on

Commonwealth law ("state law"). The chart below summarizes the counts, states which defendants are alleged liable in which capacities, and lists the relief sought.

| Cause of Action | Defendants | Relief Sought |
|---|---|---|
| 1. Unreasonable seizure in violation of the Fourth and Fourteenth Amendments: 42 U.S.C. § 1983 | Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment |
| 2. Deprivation of a liberty interest created by CNMI's Involuntary Civil Commitment Act in violation of Fourteenth Amendment due process: 42 U.S.C. § 1983 | Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment |
| 3. Deprivation of a liberty interest in freedom from physical and chemical restraint created by CNMI's Patient's Rights Act in violation of Fourteenth Amendment due process: 42 U.S.C. § 1983 | Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment |
| 4. Deprivation of a liberty interest in access to a telephone created by CNMI's Patient's Rights Act in violation of Fourteenth Amendment due process and the First Amendment: 42 U.S.C. § 1983 | Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment |
| 5: Deprivation of liberty in violation of the Fourteenth Amendment based on a failure to train: 42 U.S.C. § 1983 | Esther L. Muna (official capacity) James C. Deleon Guerrero (official capacity) | Injunctive Relief Declaratory Judgment |
| 6. Unlawful discrimination in violation of the Americans with Disabilities Act: 42 U.S.C. § 12132: 42 U.S.C. § 1983 | Commonwealth CHC Muna (official capacity) Deleon Guererro (official capacity) Manglona (both capacities) Claassens (both capacities) | Declaratory Judgment Damages (Manglona and Claassens only) |
| 7. Breach of Settlement Agreement | Commonwealth CHC Claassens | Damages Injunctive Relief |
| 8. Unreasonable seizure in violation of Article I, §§ 3 & 5 of the Commonwealth Constitution | Commonwealth CHC Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment |
| 9. Deprivation of liberty interest created by CNMI's Involuntary Civil Commitment Act without due process in violation of Article I, § 5 of the Commonwealth Constitution | Commonwealth CHC Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment |

| Cause of Action | Defendants | Relief Sought |
|---|---|---|
| 10. Deprivation of liberty interest in freedom from physical and chemical restraint created by CNMI's Patient's Rights Act in violation of Article I, § 5 of the Commonwealth Constitution | Commonwealth<br>CHC<br>Manglona (both capacities)<br>Claassens (both capacities)<br>Does 1–10 (both capacities)) | Damages (Compensatory and Punitive)<br>Declaratory Judgment |
| 11. Deprivation of right to telephone access as established by CNMI's Patient's Rights Act in violation of Article I, §§ 2 & 5 of the Commonwealth Constitution | Commonwealth<br>CHC<br>Manglona (both capacities)<br>Claassens (both capacities)<br>Does 1–10 (both capacities) | Damages (Compensatory and Punitive)<br>Declaratory Judgment |
| 12. Violation of Patient's Rights Act for failure to provide a copy of rights | Commonwealth<br>CHC<br>Claassens<br>Does 1–10 | Declaratory Judgment |
| 13. Negligence | Unspecified Defendants | Unspecified |

The Defendants argue that the Court lacks jurisdiction over the Commonwealth, CHC, and the official-capacity Defendants based on sovereign immunity. They also argue that several counts should be dismissed for failure to state a claim. Finally, the Defendants ask the Court to order Christian to provide a more definite statement of her claims. The Court will address the arguments in turn.

## IV.   JURISDICTION

### a.   Introduction

Defendants argue that this Court lacks subject matter jurisdiction over the Commonwealth, CHC, and defendants named in their official capacities (collectively, the "official capacity Defendants") because the Commonwealth enjoys sovereign immunity.[3] (Def. Suppl. Br. 1–9, ECF No. 25.) However, in *Fleming v. Department of Public Safety*, the Court of Appeals for the Ninth

---

[3] The parties do not dispute that the Court has statutory subject matter jurisdiction over each of the counts in the Complaint based on its federal question and supplemental jurisdiction. *See* 28 U.S.C. §§ 1332, 1367. Rather, the Commonwealth's asserted sovereign immunity would displace that jurisdiction. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 122–23 (1984) (noting that the general principles of judicial economy in favor of pendent jurisdiction over state law claims cannot overcome sovereign immunity).

Circuit held that the Commonwealth waived sovereign immunity to suits filed in federal court based on federal law when it entered into the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"). 837 F.2d 401, 405, 407 (9th Cir. 1988). Defendants propose two reasons for the Court to avoid a similar holding in this case. First, they argue that *Fleming* does not apply to Counts 7–13 (the state law counts) because its holding was limited to suits filed in federal court based on federal law, not state law. (Def. Suppl. Br. 4–5.) Alternatively, Defendants argue that *Fleming* has been substantially undermined by subsequent Supreme Court decisions, and urge the Court to find that it is no longer good law. (*Id.* 5–6.)

Having considered Defendants' arguments and conducted its own review of the relevant caselaw, the Court agrees that there are reasons to doubt the viability of *Fleming*'s rationale and holding. Nevertheless, that decision remains binding and this Court will faithfully apply it. Following the logic of *Fleming*, the Court finds that the Commonwealth waived its immunity to all suits in federal court, whether based on federal or state law. The Court will therefore assert jurisdiction over all of Christian's claims as if the official-capacity defendants enjoyed no sovereign immunity to the federal venue whatsoever.

### b.  Analysis

The question presented is whether the Commonwealth enjoys sovereign immunity over claims based on state law brought in federal court. Under ordinary principles of sovereign immunity, the answer would be yes. *Pennhurst*, 465 U.S. at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). However, *Fleming* forces a different conclusion.

Sovereign immunity prevents a federal court from exercising Article III jurisdiction over a

7

state. *In re New York*, 256 U.S. 490, 497 (1921) ("the entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a state without consent given"); *see* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."). The doctrine also prevents states from being sued in any court on the basis of federal law, with limited exceptions. *Alden v. Maine*, 527 U.S. 706, 712 (1999) (stating that a provision of the FLSA purporting to authorize private actions against states in state courts was invalid because Congress lacks Article I authority to subject a state to private suits for damages in state courts); *cf. United States v. Georgia*, 546 U.S. 151, 158 (2006) (finding that Title II of the Americans with Disabilities Act ("ADA") validly abrogates states' sovereign immunity pursuant to section 5 of the Fourteenth Amendment). A state's agencies and employees sued in official capacities are protected in the same way as the state itself. *See Florida Dep't of Health and Rehabilitative Servs. v. Florida Nursing Home Ass'n*, 450 U.S. 147, 150 (1981); *Cory v. White*, 457 U.S. 85, 91 (1982).

With the exception of the Commonwealth, every United States territory with a federal court enjoys sovereign immunity, and has throughout this nation's history. *See Kawananakoa v. Polyblank*, 205 U.S. 349, 353–54 (1907) (finding that then-territory Hawaii enjoyed sovereign immunity); *Porto Rico v. Rosaly*, 227 U.S. 270, 274 (1913) ("'It may be justly asserted that Porto Rico is a completely organized territory, although not a territory incorporated into the United States, and that there is no reason why Porto Rico should not be held to be such a territory'" for purposes of sovereign immunity) (quoting *New York ex re. Kopel v. Bingham*, 221 U.S. 468, 476 (1909)); *Harris v. Boreham*, 233 F.2d 110, 114 (3d Cir. 1956) (Virgin Islands); *Richardson v. Knud Hansen Mem'l Hosp.*, 744 F.2d 1007, 1010 (3d Cir. 1984) (same); *Crain v. Guam*, 195 F.2d

414, 416–17 (9th Cir. 1952) (Guam); *Marx v. Government of Guam*, 866 F.2d 294, 297–99 (9th Cir. 1989) (same).

A state may waive its immunity to suit in federal court, but to do so, the waiver must be unequivocally expressed, or "stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (internal quotation marks omitted); *see Pennhurst*, 465 U.S. at 99. The state controls the scope of the waiver, and may waive generally by statute, or specifically on a case-by-case basis. *See Lapides v. Board of Regents*, 535 U.S. 613, 616 (2002) (holding that a state waives its sovereign immunity when it removes a case from state to federal court).

In *Fleming*, the Ninth Circuit addressed two distinct but related questions: (1) whether the Commonwealth was a "person" for purposes of 42 U.S.C. § 1983,[4] and (2) whether the Commonwealth enjoyed sovereign immunity. 837 F.2d at 404–8. Relying on earlier Ninth Circuit caselaw, *Fleming* held that the Commonwealth was a "person" for purposes of section 1983. *Id.* at 406. Therefore, a plaintiff could sue the Commonwealth unless sovereign immunity presented a jurisdictional bar. *See id.* at 407 ("We note that were states not persons under [section 1983], the issue of eleventh amendment immunity would not arise . . . [and] the section would simply be inapplicable to the states by its terms.").[5]

To determine whether the Commonwealth enjoyed sovereign immunity, *Fleming* looked

---

[4] Section 1983 creates a federal civil cause of action for violations of constitutional and federal rights by state actors:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.

[5] *Fleming*'s holding that the Commonwealth is a "person" under section 1983 is no longer good law. *See DeNieva v. Reyes*, 966 F.2d 480, 483 (9th Cir. 1992).

9

to the Covenant. *Id.* at 405. In section 501(a), the Covenant expressly incorporates certain provisions of the U.S. Constitution:

> To the extent that they are not applicable of their own force, the following provisions of the Constitution of the United States will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States: Article I, Section 9, Clauses 2, 3, and 8; Article I, Section 10, Clauses 1 and 3; Article IV, Section 1 and Section 2, Clauses 1 and 2; Amendments 1 through 9, inclusive; Amendment 13; Amendment 14, Section 1; Amendment 15; Amendment 19; and Amendment 26; provided, however, that neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law. Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands, will be applicable within the Northern Mariana Islands only with approval of the Government of the Northern Mariana Islands and of the Government of the United States.

*Fleming* found that the meticulousness displayed by the Covenant drafters in incorporating some— but not all—constitutional provisions meant that any omissions must have been deliberate. *Id.* at 405. The Eleventh Amendment is not expressly included in section 501(a). Accordingly, *Fleming* found that the absence of the Eleventh Amendment was deliberate. *Id.* The Court next held that by deliberately leaving the Eleventh Amendment out of the Covenant, the drafters unequivocally intended to waive Eleventh Amendment immunity. *Id.* (quoting *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 454 (1793) (opinion of Wilson, J.)).

*Fleming* then considered whether the Commonwealth enjoyed any residual common law immunity apart from the Eleventh Amendment, but held that the Covenant impliedly waived all immunity to suits in federal court based on federal law. 837 F.2d at 407. It noted that there is "no meaningful distinction between eleventh amendment immunity and common law sovereign immunity," and reiterated its finding that the absence of the Eleventh Amendment from section 501(a) of the Covenant represented the drafters' "intent[ion] to forego *any* sovereign immunity from suit in federal court that the Commonwealth might otherwise enjoy." *Id.* (emphasis added).

In support of its finding that the Covenant waived the Commonwealth's sovereign immunity to suits based on federal law and filed in federal court, *Fleming* referred to the "authoritative" *Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands* (the "Analysis") by the Marianas Political Status Commission. *Id.* at 408. In its discussion of section 103 of the Covenant—which substantially guarantees the Commonwealth the right of self-governance—the Analysis provides that "the Government of the Northern Mariana Islands will have sovereign immunity, so that it cannot be sued on the basis of its own laws without its consent." Analysis 11 (1975). *Fleming* found that by negative inference, the Analysis of section 103 waived any sovereign immunity to federal suits in federal court by adopting state law immunity. 837 F.2d at 408.

### c. Arguments

Defendants make two principal arguments for not applying *Fleming* to this case and finding that the Commonwealth enjoys sovereign immunity from suits in federal court based on state law. First, Defendants contend that *Fleming* should be limited to its holding that the Commonwealth waived immunity only with respect to suits based on federal law filed in federal court. (Def. Suppl. Br. 4–5.) Second, Defendants assert that *Fleming* has been significantly undermined by subsequent caselaw, and that this Court should therefore decline to apply it at all. (*Id.* 5–6.) The Court also notes several problems with the rationale of the decision, which suggest that it overlooked critical sections of the Covenant and relevant caselaw. However, because neither the Supreme Court nor an en banc panel of the Ninth Circuit has directly undermined *Fleming*'s holding—despite concerns raised more recently by a different panel—this Court will stay true to *Fleming* as binding precedent and reject Defendants' contentions. *See Hart v. Massanari*, 266 F.2d 1155, 1170 (9th Cir. 2001) ("Binding authority must be followed unless and until overruled by a body competent

11

to do so."). The Court will address the arguments in turn.

Defendants first argue that *Fleming*'s limited holding and reliance on the Analysis suggests that the Commonwealth enjoys immunity to suits in federal court based on state law. (Def. Suppl. Br. 4–5.) *Fleming* "conclud[ed] that in entering into the Covenant the Commonwealth impliedly waived whatever immunity it might otherwise have enjoyed against suits *in federal court arising under federal law*." 837 F.2d at 407 (emphasis added). Additionally, quoting the Analysis, *Fleming* argued that the Commonwealth "cannot be sued on the basis of its own laws without its consent" to support its conclusion that "the Commonwealth does not retain sovereign immunity from federal suits." *Id.* at 408. Defendants contend that it would be inconsistent for the Commonwealth's immunity to depend on venue, i.e., that it could be sued on the basis of its own laws in federal court, but not state court. (Def. Suppl. Br. 5.) To resolve that purported conflict, Defendants suggest that *Fleming* must have intended to exempt the Commonwealth from state claims in federal court. (*Id.*) The Court does not share Defendants' interpretation.

More likely, *Fleming* reiterated the commonsense notion that the Commonwealth can determine the scope of its own liability as a matter of state law. That way, whether the Commonwealth were sued in state court applying its own law, or in a federal court applying state law, the Commonwealth's liability would not change. In other words, the Court does not interpret *Fleming* as expressing a departure from ordinary *Erie* doctrine principles. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state.").

If this Court were to adopt Defendants' interpretation, it would have to ignore *Fleming*'s finding that "where the drafters of the Covenant rejected the protections of the Eleventh Amendment, they must have also intended to forego *any sovereign immunity from suit in federal*

*court* that the Commonwealth might otherwise enjoy." 837 F.2d at 407 (emphasis added). Indeed, if the drafters of the Covenant intended to waive only the Commonwealth's immunity to lawsuits based on federal law—but not its immunity to suits filed in federal court—then doing so by excluding the Eleventh Amendment would have made no sense, because reference to the Eleventh Amendment encompasses both sorts of immunity. *Cf. Alden*, 527 U.S. at 713 (stating that court references to "Eleventh Amendment immunity" are "convenient shorthand but something of a misnomer" because sovereign immunity "neither derives from, nor is limited by, the terms of the Eleventh Amendment"). Defendants' contrary interpretation would make the drafters' decision completely illogical, an unacceptable supposition.

Defendants next argue that *Fleming* has been significantly undermined by subsequent Supreme Court cases, and thus that this Court should recognize *Fleming*'s abrogation and apply the sovereign immunity analysis that any other jurisdiction would enjoy. (Def. Suppl. Br. 5–6.) For instance, in *Virginia Office for Protection & Advocacy v. Stewart*, the Supreme Court stated that the Eleventh Amendment "only eliminates the basis for our judgment in the famous case of *Chisholm v. Georgia* [1793], which involved a suit against a State by a noncitizen of the State," but that sovereign immunity preexisted the Constitution and was not altered by Article III's jurisdictional grant to federal courts. 131 S. Ct. 1632, 1637–38 (2011) (internal citations omitted). Defendants contend that, by looking only at whether the Eleventh Amendment appeared in the Covenant, *Fleming* failed to consider preexisting immunity. (Def. Suppl. Br. 5–6.)

However, Defendants' argument was rejected—not unsympathetically—in *Norita v. Northern Mariana Islands*. 331 F.3d 690, 696–97 (9th Cir. 2003). In that case, the Ninth Circuit found that *Fleming* had not been abrogated by recent Supreme Court cases describing sovereign immunity as preexisting the Eleventh Amendment because that interpretation long predated

*Fleming. Id.* at 696 (citing *Hans v. Louisiana*, 134 U.S. 1, 12–13 (1890)). As a general rule, *Norita* stated that an appellate panel may not overrule another panel absent intervening Supreme Court precedent. 331 F.3d at 696. Because the interpretation of the Eleventh Amendment that the Commonwealth asserted as abrogating *Fleming* actually predated that case, it could not have been an *intervening* factor in abrogating the decision, and the Court found itself bound by the earlier panel's holding. *Id.* at 696–97. To the extent that *Fleming* failed to consider whether the drafters of the Covenant left the Eleventh Amendment out of section 501(a) because they relied on the preexisting common law immunity, rather than the convenient shorthand of the Eleventh Amendment, *Fleming* erred in the first instance, and no amount of further clarification from the Supreme Court can impliedly abrogate the decision any further. Because this matter presents the same situation as *Norita*, the Court must again follow precedent and reject Defendants' argument. *Id.*[6]

Of course, as Defendants argue, *Fleming* may have been wrongly decided. As a matter of statutory construction, it is unclear why *Fleming* demanded that the Eleventh Amendment appear in section 501(a) of the Covenant. That section—which bears a striking resemblance to the 1968 civil rights provisions of Guam's Organic Act[7]—codifies nearly every individual right guaranteed by the Constitution, as well as some substantive *limitations* on the authority of the Commonwealth,

---

[6] In *Norita*, the Commonwealth prevailed on the merits and did not seek en banc review of *Fleming*'s sovereign immunity ruling. 331 F.3d at 697–99; *see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993) (holding that a district court order denying a state or state entity sovereign immunity from suit in federal court may be directly appealed under the collateral order doctrine).

[7] The "Bill of Rights" provisions of Guam's Organic Act, amended by Congress in 1968, provides:

> The following provisions of and amendments to the Constitution of the United States are hereby extended to Guam to the extent that they have not been previously extended to that territory and shall have the same force and effect there as in the United States or in any State of the United States: article I, section 9, clauses 2 and 3; article IV, section 1 and section 2, clause 1; the first to ninth amendments inclusive; the thirteenth amendment; the second sentence of section 1 of the fourteenth amendment; and the fifteenth and nineteenth amendments.

48 U.S.C. § 1421b(u); Pub. L. No. 90-497, § 10, 82 Stat. 842, 847 (1968).

such as printing its own money or going to war. Covenant § 501(a); *see* U.S. Const. art. I, § 9, cls. 2 (habeas corpus), 3 (federal bills of attainder and ex post facto laws), 8 (titles or gifts of nobility); § 10, cls. 1 (state treaties, money, bills of attainder, ex post facto laws, or impairment of contracts), 3 (state wars); art. IV, §§ 1 (full faith and credit), 2, cls. 1 (privileges and immunities), 2 (delivery of fugitives); amends. 1 (free speech, religion, assembly), 2 (bear arms), 3 (quarter soldiers), 4 (unreasonable searches and seizures), 5 (compelled testimony, double jeopardy, due process), 6 (speedy public trial, jury trial, confrontation, assistance of counsel), 7 (civil jury trial), 8 (excessive bail, cruel and unusual punishment), 9 (unenumerated rights retained), 13 (abolition of slavery), 14, § 1 (privileges or immunities, due process, equal protection), 15 (vote), 19 (women's suffrage), 26 (suffrage at age 18). Constitutional provisions that neither secure an individual right nor limit the power of the states—such as the Eleventh Amendment—are simply not present in section 501(a). Neither are other constitutional provisions, such as Article II. However, it would be ludicrous to argue that the Covenant rejected the federal executive branch, despite its absence from section 501(a). In sum, the Eleventh Amendment's absence from section 501(a) has no bearing on the intentions of the drafters with respect to sovereign immunity. *See* Analysis 39 ("The purpose of [section 501] is to extend to the people of the Northern Marianas the basic rights of United States citizenship.").

        The Covenant does not specifically provide for the Commonwealth's sovereign immunity. Instead, like the Constitution, the Covenant creates a limited federal judicial power with sovereign immunity implied: "The District Court for the Northern Mariana Islands will have the jurisdiction of a district court of the United States." Covenant § 402(a); *see* § 401 (placing this Court under the Ninth Circuit). Because United States district courts lack jurisdiction over private claims against states and territories, section 402(a) presumably mandates the same deficiency for this Court's

jurisdiction over private actions against the Commonwealth. *Cf.* Covenant § 403(b) (stating that Title 28 of the United States Code—which includes jurisdictional grants for federal question, diversity, and supplemental cases—applies to the Commonwealth to the same extent it applies to Guam). *Fleming* failed to address whether section 402(a), by creating a federal court of identical jurisdiction to any other federal court, meant what it said. That omission was almost certainly determinative. *See* 837 F.2d at 407 (stating that if the drafters of the Covenant did not "intend[] to forgo any sovereign immunity from suit," then "their decision to exclude the eleventh amendment would make little sense and have been of no practical effect").

Without overlooking section 402(a), *Fleming* could not have satisfied the requirement that any waiver of sovereign immunity be "unequivocally expressed." *Pennhurst*, 465 U.S. at 99; *see Addington v. Texas*, 441 U.S. 418, 432 (1979) ("The term 'unequivocal,' taken by itself, means proof that admits of no doubt."). Section 402(a) provides another "reasonable construction" of the Covenant and nicely harmonizes the absence of Article III and the Eleventh Amendment in section 501(a) with the establishment of the judicial power in Article IV. *See Edelman*, 415 U.S. at 673.

Even if the Covenant were silent on the issue of immunity, the Commonwealth Constitution and statutes indicate that the Commonwealth did not intend to waive immunity to suit in federal court. *See* CNMI Const. Art. I, § 3(c) ("A person adversely affected by an illegal search or seizure has a cause of action against the government within limits provided by law"); 3 CMC §§ 2202, 2251 (partially waiving immunity to claims created by state law but providing that the Commonwealth courts would have exclusive original jurisdiction).[8] In *Atascadero State Hospital*

---

[8] To the extent that Defendants argue that the Commonwealth Constitution or statutes provide independent bases for finding sovereign immunity, the Court rejects the argument based on *Fleming*. The Covenant is the supreme law of the Commonwealth, and *Fleming* determined that it waived sovereign immunity. Accordingly, the Commonwealth's Constitution or statutes cannot depart from the Covenant and create sovereign immunity. *See* Covenant § 102 (Covenant supremacy).

*v. Scanlon*, the Supreme Court held that Article III, section 5 of the California Constitution—which provided that "suits may be brought against the State in such manner and in such courts as shall be directed by law"—was not a waiver of sovereign immunity because it did "not specifically indicate the State's willingness to be sued in federal court." 473 U.S. 234, 241 (1985) ("[I]n order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in *federal court*.") (emphasis in original). Here, not only the does the statute *not* express a specific waiver of immunity to be sued in federal court, the Commonwealth's intention that state law cases remain in state court is explicit.

*Fleming* is an outlier in federal sovereign immunity jurisprudence that drastically departs from hundreds of years of precedent. The decision inverted the requirement that a state unequivocally waive immunity by requiring specific language in the Covenant to show that the Commonwealth did *not* waive its immunity.[9] Regardless, this Court cannot depart from *Fleming*. The Court asserts subject matter jurisdiction over all the claims against Defendants. *See* 28 U.S.C. §§ 1332, 1367. Defendants' motion to dismiss based on sovereign immunity is therefore denied.

---

[9] *Fleming*'s inversion was no accident. Quoting Justice Wilson's opinion in *Chisholm v. Georgia*, *Fleming* stated that "in an instrument well drawn, as in a poem well composed, silence is sometimes most expressive" for its proposition that leaving the Eleventh Amendment out of the Covenant represented a waiver of sovereign immunity. 837 F.2d at 405 (quoting 2 U.S. (2 Dall.) at 454). *Chisholm*, of course, is the most infamous case in the Supreme Court's sovereign immunity jurisprudence. In that 1793 case, the Supreme Court held that Article III's grant of federal jurisdiction to controversies "between a State and Citizens of another State" meant—by its plain text—that federal courts had diversity jurisdiction over suits against states by citizens of other states. 2 U.S. at 479. The decision was so massively unpopular that within days of its second anniversary, Congress had proposed, and three-fourths of the states had ratified, the Eleventh Amendment, which reversed its particular holding. U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.").

The irony of *Fleming* relying on *Chisholm* is not lost on this Court. Nearly two centuries after the American people—through the extraordinary remedy of constitutional amendment—reestablished state sovereign immunity in the face of Justice Wilson's hypertextualist misconstruction of Article III, *Fleming* reanimated it for exactly the same forbidden purpose—to eliminate sovereign immunity. *See Alden*, 527 U.S. at 730 ("To rest on the words of the Amendment alone would be to engage in the type of ahistorical literalism we have rejected in interpreting the scope of the States' sovereign immunity since the discredited decision in *Chisholm*."); *Hans*, 134 U.S. at 12, 15 (approving Justice Iredell's historical and experiential approach in his *Chisholm* dissent).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## V.    FAILURE TO STATE A CLAIM

The Court next addresses the Defendants' arguments for dismissing the remaining claims. As an initial matter, the Court notes that in her opposition brief and at the October 2, 2014 hearing, Christian voluntarily moved to dismiss Manglona, Claassens, Deleon Guerrero, and Muna from Count 6, Manglona from Count 11, Claassens in his official capacity from Count 12, and Manglona and Claassens from Count 13. (Min. Entry 2, ECF No. 24.) The Court granted the motion at the hearing. (*Id.*)

*Motion to Dismiss Standard*

To survive a motion to dismiss for failure to state a claim, a complaint must contain "sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). Courts draw reasonable inferences in a plaintiff's favor, and a "well-pleaded complaint may proceed even if it appears that recovery is very remote and unlikely," but "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (internal quotation marks and citations omitted). The purpose of this standard is "to give fair notice and to enable the opposing party to defend itself effectively[,]" and to ensure "that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Bacca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### a.    THE FEDERAL CLAIMS

*Count 1:    Unreasonable seizure in violation of the Fourth and Fourteenth Amendments: 42 U.S.C. § 1983*

In Count 1, Christian alleges that Manglona, Claassens, and Does 1–10 violated her Fourth Amendment right against unreasonable seizure when they entered her residence and detained her. (Compl. ¶ 81.) She also alleges a Fourth Amendment violation from Manglona, Claassens, and

18

Does 1–10 for "physically and chemically restraining" her. (Compl. ¶ 82.) Claassens and Manglona argue that the pleadings fail to allege sufficient facts to make out an unreasonable-seizure claim. (Claassens Mot. 5–6; Manglona Mot. 7–10.) In particular, both men argue that "there are other plausible explanations for the facts alleged in the [Complaint]." (Manglona 7.) However, because "other plausible explanations" is not the law, the Court rejects their arguments.

The Fourth Amendment secures the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The seizure of a dangerous mentally ill person, like that of a person accused of a crime, must be supported by probable cause. *Maag v. Wessler*, 960 F.2d 773, 775 (9th Cir. 1991); *see O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) ("A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement."). In the Commonwealth, a person may not be detained unless "the individual is mentally ill and presents a danger to self or others." 3 CMC §§ 2504(b), 2501(h) (defining "danger to self or others" as an "imminent and substantial danger to self or other persons evidenced by recent overt acts, attempts or threats . . . includ[ing] attempting to commit suicide or inflict serious bodily harm upon self or others by violent or other actively self-destructive means").

Stripped of legal conclusions, the Complaint alleges that Christian was at home when Manglona and Does 1–10 arrested her on Claassens' orders. Nothing in the pleadings suggest that Christian was behaving in a manner that presented a danger to herself or others. Similarly, nothing in the Complaint suggests that Claassens, Manglona, or Does 1–10 observed such a danger. The Court can reasonably infer that the Defendants lacked probable cause to arrest her or take her from her home for mental evaluation. *See Twombly*, 550 U.S. at 555–56.

Similarly, nothing in the Complaint suggests that Christian was behaving in a dangerous

19

manner at the Rota Health Center. It therefore appears that the Defendants lacked probable cause to physically and chemically restrain her.

Claassens and Manglona argue that, pursuant to *Iqbal*, if a court may infer an "alternative explanation" for the alleged facts that shows a defendant may have acted lawfully, then the plaintiff has failed the pleading standard and the case should be dismissed. (Claassens Mot. 6.) In particular, they argue that the facts suggest probable cause. (*Id.*) The Court disagrees.

*Iqbal* allows a court to dismiss implausible claims. 556 U.S. at 683. If the facts of a claim support competing explanations for a defendant's conduct—i.e., that it was lawful under one explanation but not the other—then a court may only dismiss the claim on plausibility grounds if the lawful explanation is so obvious that it renders the unlawful explanation implausible by comparison. *Iqbal*, 556 U.S. at 682 (explaining that the "obvious alternative explanation" for the disparate effect of post–September 11 law enforcement efforts on Muslims was not "invidious discrimination," but the likely identity of the Al Qaeda terrorists and their cohorts as Arab Muslims); *see Starr*, 652 F.3d at 1214 (noting that the Court in *Iqbal* "concluded that this explanation was so likely to be true that, as between the two explanations, Iqbal's explanation was not plausible"). Here, unlike *Iqbal*, there is no reason to think that it is more likely that the Defendants had probable cause than that they did not. The Defendants bear the burden of persuasion that the pleadings are insufficient, and the Court will not relieve them of that burden by creating a presumption that government actors obey the Fourth Amendment, which their erroneous *Iqbal* interpretation would create. The Defendants will have an opportunity to fill in any gaps they perceive in the pleadings in discovery.

Although not specifically alleged in Count 1, the parties also raise the issue of excessive force in violation of the Fourth Amendment. Manglona argues that his use of force in pinning

Christian's arm behind her back and carrying her down the steps of her home was reasonable, and points out that Christian did not allege that she was injured. (Manglona Mot. 9–10.) Christian argues that, because Manglona lacked probable cause, any force used was excessive. (Opp'n to Manglona Mot. 6.) She also argues that, even if Manglona had probable cause, he used more force than was necessary. (*Id.*)

Christian's first argument—that any exercise of force absent probable cause must be excessive—is not the law. *See Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) ("Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa."). When an officer lacks probable cause to believe that a mentally ill person poses a danger to herself or others but nevertheless arrests the person, the Fourth Amendment violation is false arrest. *Id.* Alternatively, for excessive-force claims, courts consider "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *cf. Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921–22 (9th Cir. 2001) ("The absence of probable cause does not grant an individual the right to offer resistance.").

With respect to Christian's second argument—that Manglona used more force than was reasonable in the circumstances—the Court finds that the pleadings fail to state a claim of excessive force. Claims of excessive force are analyzed under the Fourth Amendment's reasonableness standard. *See Graham*, 490 U.S. at 395–96. Here, Manglona "twisted plaintiff's arm up behind her, carried [her] down the stairs, and handcuffed [her]." (Compl. ¶ 25.) He did not strike her or use a weapon, and Christian was not injured. A reasonable officer in the same situation would likely employ the same minimal force. *See Graham*, 490 U.S. at 396 ("Not every push or

21

shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." (internal quotation marks and citations omitted)).

To the extent that Count 1 raises a claim of excessive force, it is dismissed without prejudice.

> Count 2:    Deprivation of a liberty interest created by CNMI's Involuntary
> Civil Commitment Act in violation of Fourteenth Amendment
> due process: 42 U.S.C. § 1983

In Count 2, Christian alleges that Manglona, Claassens, and Does 1–10 violated the Commonwealth's Involuntary Civil Commitment Act, which she argues secures a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. (Compl. ¶¶ 86–87.) In particular, Christian alleges two omissions in violation of the Act: (1) no one applied for 72-hour emergency detention under oath or affirmation pursuant to 3 CMC § 2503; and (2) Claassens failed to assess Christian to determine the "appropriateness of the involuntary detention, consistent with the least restrictive alternative principle" in violation of 3 CMC § 2504(a). (*Id.* ¶ 86.) Christian was injured by these failures because she had not committed any "acts evidencing danger to self or others within 24 hours of the application for commitment" and detention was not based on "statements of persons with first-hand knowledge" in violation of 3 CMC § 2504(b). (*Id.*) Manglona argues that he had no duty to fill out an application to commit Christian, and that even if he did, the provisions of the Involuntary Civil Commitment Act do not create or secure a constitutional right. (Manglona Mot. 11–14.) Claassens argues that the pleadings are insufficient. (Claassens Mot. 6–9.) Because the liberty interest in freedom from involuntary commitment is already secured by the Fourth Amendment, the Court will dismiss Count 2.

The Involuntary Civil Commitment Act establishes a two-step process for admitting an individual for an emergency 72-hour detention. First, if a peace officer or any other person has

probable cause to believe that an individual is mentally ill and dangerous, he may take that person for a psychiatric evaluation and file a statement under oath of his reasons for believing that the individual is mentally ill and dangerous. 3 CMC § 2503.[10] Next, a mental health professional or attending physician must examine the individual to determine the appropriateness of involuntary detention "consistent with the least restrictive alternative principle." 3 CMC § 2504(a).[11] The

---

[10] The statute provides:

(a) Any person may bring another to an evaluation facility and file an application with an evaluation facility for the 72-hour emergency detention of an allegedly mentally ill person. Such facility shall require an application in writing stating the circumstances under which the person's condition was called to the attention of the applicant. The applicant must stay with the person until assessment is completed and, if applicable, the person is admitted for evaluation.

(b) A peace officer having probable cause to believe that a person is subject to the provisions of this article for 72-hour emergency detention may take into custody and transport the person to the evaluation facility and there file an application for a 72-hour emergency detention (non-court hearing). Only a peace officer may use reasonable force to restrain and detain the allegedly mentally ill person. A peace officer may call a mental health professional, when available, to the scene in order to assist him in making a probable cause determination before transporting the person to an evaluation facility.

(c) The documentation in the application shall include detailed information regarding the factual circumstances and observations constituting probable cause for involuntary psychiatric evaluation and treatment. The application shall be subscribed under oath or affirmation. The application shall be made part of the clinical record.

(d) If the peace officer has stated in the application that the allegedly mentally ill person may be charged with a crime, and, upon assessment, the person is not admitted for 72-hour emergency detention to the evaluation facility, then the mental health professional or attending physician making the assessment shall notify the peace officer, if he is still present, or the police department in other cases that the person is not being admitted.

(e) A mental health professional designated by the director or an attending physician may involuntarily admit the allegedly mentally ill person into an evaluation facility.

(f) Any person intentionally giving a false statement on an application, knowing it to be false, which leads to a commitment shall also be liable in a civil action. The applicant shall be subject to applicable criminal laws.

3 CMC § 2503.

[11] The statute provides:

(a) Prior to admitting a person to the evaluation facility for evaluation and treatment pursuant to the 72-hour emergency detention provision of 3 CMC § 2503, the mental health professional or attending physician shall assess the individual in person to determine the appropriateness of the involuntary detention, consistent with the least restrictive alternative principle and commitment criteria of this section.

(b) Detention of a person under this 72-hour provision is appropriate if and only if the individual is mentally ill and presents a danger to self or others. Detention of a person under this 72-hour provision does not apply to persons allegedly gravely disabled. For purposes of this section, the

mental health professional may admit the individual for 72-hour emergency detention "if and only if the individual is mentally ill and presents a danger to self or others" and any acts evincing such dangerousness took place "within 24 hours of the application for commitment" and are "based on statements of persons with first-hand knowledge, competent to testify." 3 CMC § 2504(b).

A state law "creates a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). Specifically, a state law must satisfy two requirements to create such an interest: "First, the law must set forth 'substantive predicates' to govern official decision making' and, second, it must contain 'explicitly mandatory language,' *i.e.*, a specific directive to the decisionmaker that mandates a particular outcome if substantive predicates have been met." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1044 (9th Cir. 2002) (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462–63 (1989)); *see Hewitt v. Helms*, 459 U.S. 460, 471–72 (1983) (focusing on "language of an unmistakably mandatory character"). "Procedural requirements do not create a liberty interest unless they cause a significant substantive reduction in decision-making or create an imperative that mandates action unless certain clearly-defined exceptions are found to apply." *Chaney v. Stewart*, 156 F.3d 921, 925 (9th Cir. 1998) (internal citations and quotation marks omitted).

However, a state law that secures the same interest as a constitutional provision cannot

---

recent acts evidencing danger to self or others must be within 24 hours of the application for commitment and be based on statements of persons with first-hand knowledge, competent to testify.

(c) If the evaluation facility admits the person under this section, it may detain him for evaluation and treatment for a period not to exceed three judicial days; provided, however, that if a person is admitted under this section on a nonjudicial day, detention may only be for 72 hours, so long as the final 24 hours occurs during a judicial day.

(d) If the person does not meet the standards for commitment pursuant to this section and 3 CMC § 2503, the person shall not be admitted involuntarily and shall be offered crisis intervention and referral for other services, as needed.

3 CMC § 2504.

create a separate due process interest. Specific constitutional text trumps state-created due process liberty interests. *Picray v. Sealock*, 138 F.3d 767, 770 (9th Cir. 1998) ("Where an amendment 'provides an explicit textual source of constitutional protection against a particular sort of government behavior,' it is that Amendment, not the guarantee of due process, that 'must be the guide for analyzing' the complaint." (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)).

Here, the Involuntary Civil Commitment Act's requirement for a detailed application under oath does not create a constitutionally protected liberty interest, because the presence of such an application is not a necessary condition for a mentally ill person to be admitted. *Compare* 3 CMC § 2503(a) (an evaluation facility "shall require an application in writing") *and* 3 CMC § 2504(d) (a person may not be involuntarily admitted if he does not meet the standards of sections 2503 and 2504) *with* 3 CMC § 2503(e) (a mental health professional may involuntarily admit a mentally ill person) *and* 3 CMC § 2504(b) (a person may be detained "if and only if [she] is mentally ill and presents a danger to self or others"). In other words, the absence of an application does not *mandate* that a person go free—it is not a necessary condition for 72-hour emergency detention—and therefore does not give rise to a liberty interest. *Valdez*, 302 F.3d at 1044–45. Rather, a physician may order an individual to be detained if, after evaluating her, the physician determines that she is "mentally ill and presents a danger to self and others." 3 CMC § 2504(b). Information evidencing that danger to self or others need not come from the applicant, but may come from anyone with "first-hand knowledge," including the physician or the allegedly mentally ill person herself. *Id.*

Because the only allegation against Manglona—that he did not fill out an application— does not rise to a constitutional level, the section 1983 action against him fails to state a claim and must be dismissed. Whether he had probable cause or not, Manglona did not involuntarily commit

Christian; Claassens did. To the extent that Manglona lacked probable cause to detain and transport Christian to Claassens in the first place, the interest is secured by the Fourth Amendment, and is adequately pleaded in Count 1. *See Picray*, 138 F.3d at 770.

With respect to Claassens, the pleadings adequately claim that Claassens violated the Involuntary Civil Commitment Act because he lacked probable cause to think that Christian was mentally ill and dangerous. (*See* Opp'n to Claassens' Mot. 7–8 ("Claassens lacked the necessary probable cause to direct defendant Manglona to detain and transport Christian in the first place. Accordingly, Christian has sufficiently alleged facts to support her claim that she was subjected to the Involuntary Commitment Act without due process.").) However, the Fourth Amendment already supplies the "process that is due" for involuntary commitment. *See Picray*, 138 F.3d at 770 (quoting *United States v. James Daniel Good Real Property*, 510 U.S. 43, 50 (1993)). If Claassens lacked probable cause to believe that Christian was a danger to herself or others as a result of her mental illness, then he lacked legal authority to order her seized no matter what the Involuntary Civil Commitment Act said. *See Maag*, 960 F.2d at 775. Christian's interest in being free from civil commitment does not vary from the Fourth Amendment to the Involuntary Civil Commitment Act, but as a matter of federal law, the Fourth Amendment controls. *Picray*, 138 F.3d at 770; *see Meyer v. Board of Cnty. Comm'rs*, 482 F.3d 1232, 1239 (10th Cir. 2007) (stating that "the seizure of a person for an emergency mental health evaluation is a restriction on the fundamental right of personal liberty and so is governed by the reasonableness requirement of the Fourth Amendment").

Count 2 is dismissed without prejudice. Christian may amend the Complaint if she can show that the Defendants violated a liberty interest created by the Involuntary Civil Commitment Act not already secured by the Fourth Amendment.

Count 3:   *Deprivation of a liberty interest in freedom from physical and chemical restraint created by CNMI's Involuntary Civil*

26

*Commitment Act in violation of Fourteenth Amendment due
process: 42 U.S.C. § 1983*

In Count 3, Christian alleges that Manglona, Claassens, and Does 1–10 violated her right
to be free from physical and chemical restraint pursuant to the Commonwealth Patient's Rights
Act, which she argues secures a liberty interest protected by the Due Process Clause of the
Fourteenth Amendment. (Compl. ¶¶ 90–94.) Manglona and Claassens argue that Christian failed
to plead facts sufficient to suggest that they plausibly violated the Patient's Rights Act. (Manglona
Mot. 14–16; Claassens Mot. 9–10.) Manglona also asserts that the Patient's Rights Act does not
apply to police officers, but only to hospital staff. (Manglona Mo. 16–17.) The Court finds that the
Patient's Rights Act creates a liberty interest in freedom from physical and chemical restraint
protected by due process, and that the pleadings adequately allege facts sufficient to make out a
claim against Claassens for drugging Christian, but that the pleadings are too vague to state a claim
against Manglona for physical restraint. However, because Christian can likely state a claim by
more carefully tailoring her pleadings, the Court will dismiss Count 3 without prejudice as to
Manglona and grant Christian leave to amend.

The Patient's Rights Act establishes a liberty interest in freedom from physical or chemical
restraint protected by the Due Process Clause of the Fourteenth Amendment[12] because it limits
official discretion to apply such restraints absent an emergency. *See Valdez*, 302 F.3d at 1044. As
a threshold matter, the Patient's Rights Act applies to "every person receiving assessment,
evaluation, care or treatment at an evaluation or treatment facility, whether voluntarily or
involuntarily, inpatient or outpatient." 3 CMC § 2551. The relevant provision of the Act states that

---

[12] Of course, an individual also has a substantive due process right to freedom from physical and chemical restraint
apart from—but protected by—the Patient's Rights Act. *See Washington v. Harper*, 494 U.S. 210, 221-22 (1990)
("We have no doubt that, in addition to the liberty interest created by the [Washington State's procedural safeguards],
respondent possesses a significant liberty interest in avoiding unwanted administration of antipsychotic drugs under
the Due Process Clause of the Fourteenth Amendment.").

patients have the "right to be free from chemical and physical restraint" unless a "mental health professional or attending physician" finds that "the patient presents an imminent threat of substantial harm to himself or others and less restrictive means are not feasible." 3 CMC § 2558(a).[13] Any such finding must be "contemporaneously document[ed] by written order." *Id.*

Here, Christian easily makes out a claim against Manglona, Claassens, and Does 1–10 for violating her liberty interest in being free from chemical restraint. Christian alleges that Manglona and Does 1–10 held her down and Claassens injected her with drugs three times over her protest. (Compl. ¶¶ 31–37.) The statute requires nothing more. 3 CMC § 2558(a) ("Persons have a right to be free from chemical and physical restraint").

Manglona and Claassens argue that Christian failed to state a claim because she did not plead that the "emergency situations" exception to the law did not apply. (Manglona Mot. 15; Claassens Mot. 10.) The Court disagrees. Ordinarily, the plaintiff bears the burden of persuasion for the essential elements of her claims, but "when such elements can fairly be characterized as affirmative defenses or exemptions," the burden "may be shifted to defendants." *Schaffer ex rel.*

---

[13] The statute provides:

> (a) Persons have a right to be free from chemical and physical restraint and isolation, except for emergency situations in which a mental health professional or attending physician contemporaneously documents by written order in the patient's medical records that the patient presents an imminent threat of substantial harm to himself or others and less restrictive means are not feasible.

> (b) Emergency use of restraints or isolation shall be for no more than two hours, after which time patients may be physically restrained or placed in isolation only on an attending physician's written order which explains the rationale for such action. The written order may be entered only after the attending physician has personally seen the patient concerned and evaluated whatever episode or situation is said to call for restraint or isolation. Such written order shall be effective for not more than 24 hours.

> (c) While in restraint or isolation the patient must be seen at least every 15 minutes by qualified ward personnel who will chart the patient's physical condition and indicate if it is compromised and also chart the patient's psychiatric condition. The patient must have bathroom privileges at least every hour and must be bathed at least every 24 hours, or before, as needed.

3 CMC § 2558.

*Schaffer v. Weast*, 546 U.S. 49, 57 (2005); *see United States v. Freter*, 31 F.3d 783, 788 (9th Cir. 1994) (noting that where a "statutory prohibition is broad and an exception is narrow, it is more probable that the exception is an affirmative defense"). Here, because the right to be free is broad and the exception—requiring an "imminent threat of substantial harm"—is narrow, the Court finds that the burden of pleading an emergency situation should be borne by Defendants as an affirmative defense, and not by Christian as an essential element.

Manglona also argues that the Patient's Rights Act does not apply to him because he was not part of Christian's assessment, evaluation, care, or treatment, as required by statute. (Manglona Mot. 16–17.) The Court agrees that police officers ordinarily will not be subject to the Patient's Rights Act, but disagrees with respect to Manglona's participation in physically and chemically restraining Christian in this case. As Manglona correctly points out, the Patient's Rights Act applies to persons "receiving assessment, evaluation, care[,] or treatment at an evaluation or treatment facility." 3 CMC § 2551. Here, Christian was allegedly brought to the Rota Health Center to receive an assessment and any necessary care or treatment, and therefore comes within the protection of the Act. By allegedly restraining Christian after the protections of the Act kicked in, Manglona violated Christian's rights, and can be held liable. If Manglona had merely transported Christian to the Rota Health Center, and thereafter left her entirely to the care of Claassens and hospital orderlies, he would probably not be the subject of this claim. With respect to chemical restraint, Christian has adequately stated a claim against Manglona.

The allegations of physical restraint are far less clear, and must be dismissed. Count 3, like all of Christian's causes of action, reincorporates every paragraph that came before it, but only describes the factual basis of her claim as the "acts of Manglona, Claassens and Does 1–10 in physically and chemically restraining" her. (Compl. ¶¶ 90, 92.) Christian alleges that she was

physically restrained at several points during her ordeal—when she was handcuffed and carried down the stairs of her home by Manglona (Compl. ¶ 25), when she was handcuffed to a stretcher for transportation (Compl. ¶ 28), when she was handcuffed to a bed at the Rota Health Center (Compl. ¶ 30), and when she was held down for Claassens to administer shots (Compl. ¶¶ 31–35)—but does not specify which acts violated the right secured by the Patient's Rights Act. Christian's claims under the Patient's Rights Act for physical restraint must be dismissed. *See Starr*, 652 F.3d at 1216 (requiring notice pleading).

In summary, Count 3 is only dismissed with regard to claims of physical restraint—the chemical restraint claim survives. If Christian amends the Complaint, she should specify which acts violated Christian's right to be free of physical restraint under the Patient's Rights Act.

> Count 4:   *Deprivation of a liberty interest in access to a telephone created by CNMI's Patient's Rights Act in violation of Fourteenth Amendment due process and the First Amendment: 42 U.S.C. § 1983*

In Count 4, Christian alleges that Claassens and Does 1–10 violated her right to have ready access to a telephone pursuant to the Patient's Rights Act, which she argues secures a right protected by the First and Fourteenth Amendments. (Compl. ¶¶ 95–99.) Claassens argues that Christian failed to plead facts sufficient to suggest that he plausibly violated the Patient's Rights Act. (Claassens Mot. 10–11.) The Court agrees, but as a threshold matter finds that Count 4 fails to state a constitutional violation. Because the Court finds that the Patient's Rights Act does not create a constitutionally protected right, it will dismiss Count 4. However, because the First Amendment secures a right not to be held completely incommunicado, the Court will grant Christian leave to amend if in fact she was so held.

In relevant part, the Patient's Rights Act provides that a person has the right to "have ready access to a telephone, both to make and receive calls in privacy." 3 CMC § 2556(a)(3). There are

30

two exceptions. First, the right to telephone access "may be denied for good cause," but "only for a specific limited and reasonable period of time by a mental health professional with the concurrence of an attending physician." 3 CMC § 2556(b) (further requiring that any such denial be "entered into the patient's treatment record" and the reason be "made available to the patient or his attorney"). Second, "persons committed pursuant to involuntary criminal commitment procedures may have the above rights limited for reasonable security considerations." 3 CMC § 2256(c).

Two Ninth Circuit cases persuade the Court that the Patient's Rights Act does not create a constitutionally protected liberty interest. In *Carlo v. City of Chino*, the Ninth Circuit held that a California law allowing an arrested person to make three phone calls within three hours "except where physically impossible" created a protected liberty interest. 105 F.3d 493, 495, 499 (9th Cir. 1997). It reasoned that "the statute substantively limits an officer's discretion because it makes a telephone call mandatory unless physically impossible." *Id.* On the other hand, in *Valdez v. Rosenbaum*, the Ninth Circuit reasoned that an Alaska statute allowing a prisoner "reasonable access to a telephone" did not create a liberty interest because it "merely entitle[d] a prisoner to 'reasonable access' to a telephone, and provide[d] prison officials with discretion to determine *what* is reasonable access under the circumstances." 302 F.3d at 1045.

Here, the statute does not mandate a level of telephone access outside official discretion, and therefore fails to create a liberty interest protected by due process. Although less discretionary than the statute in *Valdez*, the Patient's Rights Act nevertheless allows hospital officials to deny a patient access to a telephone for "good cause" for a "reasonable period." 3 CMC § 3556(b). Absent a greater mandate, the statute cannot create a constitutionally protected liberty interest in patient telephone access. *See Thompson*, 490 U.S. at 464.

31

Christian alleges only that she was denied "ready access to a telephone"—not that she was held incommunicado with the outside world. (Compl. ¶¶ 40, 46.) However, the pleadings also allege that Does 1–10 at the psychiatric ward of the Commonwealth Health Center prevented Christian from using her cellphone and computer. (Compl. ¶ 48.) If Christian was not permitted to bring her plight to the attention of others outside CHC's control, without reason, then her First and Fourteenth Amendment rights were violated even in the absence of the Patient's Rights Act. *Valdez*, 302 F.3d at 1048 (finding a First Amendment "right to communicate with persons outside prison walls"); *see Carlo*, 105 F.3d at 496 (stating that the Fourteenth Amendment provides an arrestee with an independent right to communicate with the outside world).

Because the pleadings only hint at such a violation, the Court will dismiss Count 4. However, Christian may amend Count 4 to plead a direct violation of the First and Fourteenth Amendments if the terms of her confinement warrant.

> Count 5:   *Deprivation of liberty in violation of the Fourteenth Amendment based on a failure to train: 42 U.S.C. § 1983*

In Count 5, Christian alleges that Deleon Guerrero and Muna demonstrated a "deliberate indifference to the constitutional rights of residents of Rota and particularly persons with mental illness" by failing to train their employees in the Department of Public Safety ("DPS") and CHC, and that the failure to train led to a deprivation of Christian's liberty interests. (Compl. ¶ 101.) Muna and Deleon Guerrero argue that Christian failed to state a claim for three reasons: (1) it is unclear which constitutional rights they allegedly violated; (2) Christian failed to show a pattern of constitutional violations; and (3) it is not clear that the alleged failures to train were the moving force behind any constitutional violation. (CNMI Mot. 12–16.) The Court agrees.

A municipality may be held liable for violating a person's due process rights by failing to train its employees if: (1) an employee violated the plaintiff's constitutional rights; (2) the

municipality had "customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). The same standard applies to an employer sued in his official capacity. *Flores v. County of Los Angeles*, 758 F.3d 1154, 1158–59 (9th Cir. 2014). However, a supervisor is not vicariously liable under section 1983 for his employees' actions; he is liable only for his own illegal acts. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").

Therefore, a court will not ordinarily find "deliberate indifference" unless "city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick*, 131 S. Ct. at 1360 ("The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring in part and dissenting in part))). A plaintiff may succeed in "proving a failure-to-train claim without showing a pattern of constitutional violations where a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with the specific tools to handle recurring situations," *Long*, 442 F.3d at 1186, but such situations will be rare. *Connick*, 131 S. Ct. at 1360–61.

With respect to the "moving force" requirement, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Canton*, 489 U.S. at 391. The relevant question is whether "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Id.*; *see Board of County Comm'rs*

33

*v. Brown*, 520 U.S. 397, 405 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.").

Here, the pleadings fail at each juncture. First, Christian does not allege which constitutional rights Muna's and Deleon Guerrero's employees allegedly violated. In her opposition brief, Christian responds to the Defendants' invitation to identify the rights violated with a fishing expedition: "the acts and constitutional violations resulting from the failure to train are set forth in the complaint" at paragraphs 15–47, 81–82, 86–87, 91–92, 96–97, and 101. (Opp'n 15, ECF No. 18.) Christian offers no further clarification. The paragraphs cited include essentially the entire factual background for the case and the substantive provisions of Counts 1–4. Strangely absent are paragraphs 62–71, captioned "failure to train." Those paragraphs refer to the requirements of the Involuntary Civil Commitment Act and the Patient's Rights Act, but fail to specify the constitutional rights allegedly violated. (Compl. ¶¶ 65, 70.) Paragraph 101, which supposedly provides the basis for Muna's and Deleon Guererro's liability, simply refers to "constitutional rights." In sum, Christian needs to specify the rights violated.

Second, even assuming for the sake of argument that Christian adequately identified a constitutional violation, the pleadings do not show deliberate indifference with respect to Deleon Guerrero. Christian asserts that "Guerrero knew or should have known" that there were defects in DPS training, but provides no facts to back up that legal conclusion, such as prior incidents involving DPS. (Compl. ¶ 65.) Additionally, DPS and Deleon Guerrero were not subject to the settlement agreement, which could have put Deleon Guerrero on notice that his officers required further training. Because the pleadings fail to allege instances showing that Deleon Guerrero had

notice that his officers were violating constitutional rights, it fails to show that he demonstrated the required deliberate indifference to warrant imposing liability. *Connick*, 131 S. Ct. at 1360.

However, with respect to Muna, the pleadings could satisfy the deliberate indifference requirement. The conduct alleged in the settlement agreement—including CHC's violations of the Involuntary Civil Commitment Act and the Patient's Rights Act—put Muna on notice that her employees were violating the law. (Settlement Agreement Recitals A–H.) To the extent that those laws create constitutionally protected interests, Muna's unwillingness to train her employees could show the necessary deliberate indifference for liability to attach. *See Connick*, 131 S. Ct. at 1360.

Finally, the pleadings fail to adequately allege causation. With respect to Deleon Guerrero, causation is impossible because he had no notice of any prior constitutional violations, and therefore lacked the deliberate indifference necessary for his failure to train to make him liable under section 1983. *See Brown*, 520 U.S. at 405. For Muna, despite notice from the settlement agreement, causation also appears to be impossible. Claassens, the CHC employee who allegedly violated Christian's rights, already had knowledge of the requirements the Involuntary Civil Commitment Act and the Patient's Rights Act, as demonstrated by his signature on the settlement agreement. (Settlement Agreement 7.) Accordingly, if Claassens continued to violate Christian's rights despite knowing he was not acting in accordance with the law, it is unclear how Muna providing additional training could have prevented the constitutional deprivation. *See Canton*, 489 U.S. at 391 ("Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?").

Count 5 is dismissed without prejudice.

Count 6:   *Unlawful discrimination in violation of the Americans with Disabilities Act: 42 U.S.C. § 12132: 42 U.S.C. § 1983*

In Count 6, Christian alleges that the Commonwealth and CHC[14] unlawfully discriminated against her on the basis of her disability in violation of Title II of the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. §§ 1983 and 12132, and seeks a declaration that her ADA rights were violated. (Compl. ¶ 104–8.) The Defendants argue that Christian failed to plead sufficient facts to show that she suffered from a disability, and similarly failed to show that she was discriminated against on the basis of her disability. (Commonwealth Mot. 17–19; Manglona Mot. 17–18; Claassens Mot. 11–12.) The Court agrees that the pleadings fail to set forth adequate facts to show discrimination based on disability, and also finds that the remedy sought— declaratory judgment—provides no relief. However, the Court will grant Christian leave to amend consistent with this order.

To prove a claim pursuant to 42 U.S.C. § 12132, a plaintiff must show: "(1) he is a 'qualified individual with a disability'; (2) he was . . . discriminated against by a public entity; and (3) such . . . discrimination was by reason of his disability." *Weinreich v. Los Angeles Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (quoting 42 U.S.C. § 12132). A person is considered "disabled"—or "regarded as having . . . an impairment"—if she has been subjected to discrimination "because of an actual or perceived physical or mental impairment." 42 U.S.C. § 12102(1)(C) and (3)(A).

The pleadings state that Christian "has been diagnosed with a mental illness and is therefore a person with a disability." (Compl. ¶ 16.) Count 6 complains that the "acts and conduct of all defendants subjected plaintiff to discrimination by reason of her disability." (Compl. ¶ 105.) Presumably, the "acts and conduct" refer to seizing Christian at her home and holding her over the

---

[14] Christian originally sued the other Defendants in Count 6, but agreed to dismiss Muna, Deleon Guerrero, Claassens, and Manglona from Count 6 at the October 2, 2014 hearing. (*See* Min. Entry 2.) Only the Commonwealth and CHC remain.

following days at Commonwealth medical facilities, although the Complaint is not clear.

Unfortunately, the Court cannot discern how Christian means to invoke the ADA. For instance, the Involuntary Civil Commitment Act explicitly refers to an application for "72-hour emergency detention of an allegedly mentally ill persons." 3 CMC § 2503(a). As Christian points out, the ADA applies to persons "regarded as having . . . an impairment." 42 U.S.C. § 12102(1)(C) and (3)(A) (stating that a person is regarded as having an impairment if she is subjected to discrimination "because of an actual or perceived . . . mental impairment whether or not the impairment limits or is perceived to limit a major life activity"). Therefore, it appears that *any* application of the Involuntary Civil Commitment Act violates the ADA because it only applies to persons perceived to be mentally ill, and therefore covered by the ADA. Such an argument would be unlikely to succeed. *Cf. Addington*, 441 U.S. at 425–26 (balancing an individual's right to be free from involuntary civil commitment with a state's *parens patriae* powers to provide care to its citizens and its police powers to protect its community from dangerous mentally ill individuals).

It is also possible that Christian means that the Defendants intentionally discriminated against her, regardless of their authority under the law. *Cf. Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (stating that a plaintiff may recover monetary damages under Title II of the ADA if she proves "intentional discrimination on the part of the defendant"). Unfortunately, the Court's review is thwarted by the minimal pleadings. Count 6 incorporates every paragraph proceeding it, but makes no effort to identify any specific discriminatory conduct or provide a rationale behind thinking any conduct was based on a discriminatory motive. Was Christian's initial seizure and detention a violation of Title II? What about Claassens' refusal to let her use the telephone? Handcuffing her to a stretcher? Christian does not say. The pleadings do not plausibly support an inference that Christian's disability was a causal factor in the Defendants' actions.

Additionally, this case poses a case-or-controversy problem: Christian seeks a declaration that her rights were violated, but does not ask the Court to do anything about it. "A case or controversy exists justifying declaratory relief only when the challenged government activity . . . is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015 (9th Cir. 1990) (internal quotation marks omitted). Here, Christian has already escaped the Commonwealth's clutches and seeks neither injunctive relief nor damages; a declaration that the Commonwealth violated her rights under Title II of the ADA would seemingly serve no purpose. *See Endsley v. Luna*, 750 F. Supp. 2d 1074, 1110 (C.D. Cal. 2010) (denying declaratory relief to an inmate who was transferred out of a facility with allegedly unconstitutional conditions because he did not face "a continuous, remediable harm that concretely affect[ed] [his] existing interests") (citations omitted). If Christian seeks to amend Count 6, she must satisfy the Court that a real case or controversy exists, and that a declaration of her rights would avail her.

Count 6 is dismissed without prejudice.

### b.   THE COMMONWEALTH CLAIMS

As explained above, the Court has supplemental jurisdiction over the claims based on Commonwealth law. *See* 28 U.S.C. § 1367.

*Count 7:   Breach of Settlement Agreement*

In Count 7, Christian alleges that the Commonwealth, CHC, and Claassens breached the settlement agreement reached after her 2011 involuntary commitment. (Compl. ¶¶ 109–12.) In particular, Christian alleges that they breached the agreement by handcuffing her at the Rota Health Center. (*Id.* ¶ 111.) The agreement indeed provides that handcuffs would not be used to restrain

persons with mental illness. (Settlement Agreement § 2, ¶ 4, Compl. Ex. A, ECF No. 10-1.) However, the terms of the agreement do not apply to Claassens, but rather to the Commonwealth, CHC, and the Rota Health Center. (Settlement Agreement § 2.) Claassens signed the agreement, but made no promises to take any action himself. (*Id.*) Because Claassens cannot be held liable for breaching promises he did not make, the Court dismisses Claassens from Count 7 with prejudice. The Commonwealth and CHC remain.

> Count 8:    *Unreasonable seizure in violation of Article I, §§ 3 and 5 of the*
> *Commonwealth Constitution*

In Count 8, Christian alleges that the Commonwealth, CHC, Manglona, Claassens, and Does 1–10 violated her right to freedom from unreasonable seizure pursuant to the Commonwealth Constitution, Article I, sections 3 and 5. (Compl. ¶¶ 113–17.) In particular, Christian alleges that two acts violated her right against unreasonable seizure: (1) Manglona and Does 1–10 removing her from her home, and (2) Manglona, Claassens, and Does 1–10 physically and chemically restraining her at the Rota Health Center. (*Id*. ¶¶ 114–15.) The Commonwealth argues that Count 8 should be dismissed because it mixes an express constitutional cause of action with an implied constitutional cause of action. (Commonwealth Mot. 12.) Manglona does not dispute that Count 8 states a claim. (Manglona Mot. 1.) Claassens argues that the pleadings provide insufficient facts to plausibly suggest that he violated the law. (Claassens Mot. 14.) The Court finds that Article I, section 3 does not create a cause of action against Commonwealth employees in their individual capacities. Additionally, the Court finds that Article I, section 5 does not provide a separate claim for conduct that would also violate Article I, section 3. However, like the Fourth Amendment claim addressed above, Christian adequately states a cause of action against the official-capacity defendants pursuant to Article I, section 3. The Court will dismiss the claims against Manglona, Claassens, and Does 1–10 in their official capacities, and claims based on Article I, section 5 with

prejudice.

Article I, section 3 of the Commonwealth Constitution substantially duplicates the Fourth Amendment. *See* N.M.I. Const. art. I, § 3 ("The right of the people to be secure in their persons, houses, papers and belongings against unreasonable searches and seizures shall not be violated."). But it also goes further. In pertinent part, Article I, section 3 provides for a cause of action against the Commonwealth if the right is violated. *Id.* § 3(c) ("A person adversely affected by an illegal search or seizure has a cause of action against the government within limits provided by law.").

By its language, Article I, section 3's cause of action does not extend to employees of the Commonwealth in their individual capacities, but only against the government itself. *See Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands* ("Constitutional Analysis") 10 (Dec. 6, 1976) (stating that section 3(c) "does not affect any cause of action against officers or employees of the government in their individual capacities"); *Rayphand v. Tenorio*, 2003 MP 12 ¶ 71 (stating that the Constitutional Analysis is "extremely persuasive authority when one is called upon to discern the intent of the framers when the language of the [Commonwealth] Constitution presents an ambiguity."). Accordingly, the pleadings do not state a cause of action against Manglona, Claassens, or Does 1–10 in their individual capacities, and the Court will dismiss those individual capacity defendants from Count 8.

Article I, section 5 secures due process rights, but does not provide a cause of action against the Commonwealth. N.M.I. Const. art. I, § 5 ("No person shall be deprived of life, liberty or property without due process of law."); *see Office of Attorney Gen. v. Honrado*, 1996 MP 15 ¶ 15 ("the protections of Article I, § 5 of the Commonwealth Constitution are coextensive with the due process clauses of the U.S. Constitution"). When the Commonwealth Supreme Court considers issues raised pursuant to Article I, section 5, it sometimes looks to federal law. *See CNMI v.*

40

*Bergonia*, 3 N.M.I. 22, 36 (1992) ("We will apply Article I, § 5 using the same analysis as for the Fourteenth Amendment.").

In this case, federal law would evaluate Christian's seizure under the Fourth Amendment, (the equivalent of Article I, section 3), not the Fifth Amendment, (the equivalent of Article I, section 5). As stated above with regard to Count 2, because Article I, section 3 already secures the right Christian asserts under Article I, section 5, the Court cannot evaluate the claim under the latter due process standard. *See Picray*, 138 F.3d at 770 ("The constitutionality of [an] arrest may only be challenged under Fourth Amendment standards.").

Accordingly, because Manglona, Claassens, and Does 1–10 cannot be held personally liable under the Commonwealth Constitution as a matter of law, Count 8 is dismissed with prejudice as to the claims against them in their individual capacities. Similarly, the Article I, section 5 claim is dismissed with prejudice. However, because Christian has alleged sufficient facts to show a seizure without probable cause in violation of Article I, section 3, the claims against the official-capacity defendants remain.

*The Article I, § 5 Counts:*

Count 9:     *Deprivation of liberty interest created by CNMI's Involuntary Civil Commitment Act without due process in violation of Article I, § 5 of the Commonwealth Constitution*

Count 10:    *Deprivation of liberty interest in freedom from physical and chemical restraint created by CNMI's Patient's Rights Act in violation of Article I, § 5 of the Commonwealth Constitution*

Count 11:    *Deprivation of right to telephone access as established by CNMI's Patient's Rights Act in violation of Article I, §§ 2 & 5 of the Commonwealth Constitution*

Counts 9–11 mirror Counts 2–4, but rather than alleging that Defendants' violations of the relevant Commonwealth laws create causes of action under federal due process, Christian argues

41

that the violations give rise to Commonwealth due process causes of action. (Compl. ¶¶ 118–22

(Involuntary Civil Commitment Act), ¶¶ 123–27 (Patient's Rights Act for chemical and physical

restraint), ¶¶ 128–32 (Patient's Rights Act for telephone calls).) Because the allegations essentially

restate the earlier Counts and rely on almost identical constitutional provisions, the Court could

simply apply the same analysis to Counts 9–11 that it did to Counts 2–4, dismissing some counts

and allowing others. (*See* Claassens Mot. 13–14 (urging just such a response).)[15] However, it does

not appear that the relevant provisions of the Involuntary Civil Commitment Act or the Patient's

Rights Act could be constitutionalized under Article I, section 5, because the Acts themselves

already provide a statutory cause of action. Accordingly, Counts 9–11 will be dismissed in their

entirety. The Court will grant Christian leave to amend directly under the statutory causes of action.

It is axiomatic that if a statute provides a cause of action to enforce its provisions, a person

seeking to enforce those provisions may rely on the statutory cause of action when filing suit.

Indeed, a statutory cause of action subsumes any action at law that a person might otherwise press

under an implied constitutional cause of action. *See Sablan v. Tenorio*, 1996 MP 08 ¶ 26 (stating

that 42 U.S.C. § 1983 "provides a substitute remedy which is equally effective to a direct cause of

action under the Constitution" and "as a matter of law, Sablan's § 1983 cause of action subsumes

any action that he might purport to state directly under the Fourteenth Amendment" (citing *Thomas

v. Shipka*, 818 F.2d 496, 500 (6th Cir. 1987) ("it is unnecessary and needlessly redundant to imply

a cause of action arising directly under the Constitution where Congress has already provided a

---

[15] The Commonwealth argues that the Court should reject what it deems an attempt by Christian to imply constitutional torts, referencing *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (creating a direct cause of action for damages under the Fourth Amendment). (Commonwealth Mot. 7–12.) Christian responds that the Court *should* create *Bivens* remedies for her. (Opp'n to Commonwealth Mot. 10–13.) Both parties are incorrect. *Bivens* deals with direct causes of action for damages under the Constitution—not constitutionalized statutory rights. *See Bivens*, 403 U.S. at 397 (finding a cause of action under the Fourth Amendment). This is not a constitutional tort case, and *Bivens* does not apply.

statutory remedy of equal effectiveness through which the plaintiff could have vindicated her constitutional rights")))). In other words, it is error to constitutionalize what is already enforceable by statute.

Here, Christian commits just such an error. The Involuntary Civil Commitment Act contains a cause of action for a patient whose rights were violated. 3 CMC § 2519(b) ("Any aggrieved person may seek to enforce the rights, obligations, and liabilities under this article."). So too does the Patient's Right Act, as Christian asserts in Count 12. *See* 3 CMC § 2563 (providing that a person "shall have the right to assert grievances arising out of the infringement of the rights enumerated in this article and the right to have a fair, timely and impartial grievance procedure provided" and that an "aggrieved person may enforce the rights, obligations and liabilities of this article").

Counts 9–11 are dismissed with prejudice as to the Commonwealth constitutional claims. If Christian seeks to assert causes of action under the Involuntary Civil Commitment Act and Patient's Rights Act, she may amend the Complaint and assert an action directly under the authority of the Acts themselves.

> *Count 12:*   *Violation of Patient's Rights Act for failure to provide a copy*
> *of rights*

In Count 12, Christian alleges that the Commonwealth, CHC, Claassens in his individual capacity, and Does 1–10 violated her rights under the Patient's Rights Acts in four ways: (1) by denying her right to be free from chemical and physical restraint; (2) by denying her ready access to a telephone to make and receive calls in privacy; (3) by failing to provide her with a list of her rights; and (4) by denying her access to her personal possessions while she was detained.[16] (Compl.

---

[16] Claassens is only alleged to have violated the first three provisions; Christian does not claim that Claassens denied her access to her personal possessions. (Compl. 48.)

43

¶¶ 133–36.) The Commonwealth and CHC do not object to Count 12 apart from sovereign immunity. (Commonwealth Mot. 23.) Claassens argues that Christian failed to exhaust administrative remedies or provide sufficient facts to make out a claim. (Claassens Mot. 14; Claassens Reply 9–10, ECF No. 20.) The Court disagrees that Christian had any duty to exhaust administrative remedies, and finds that Christian stated a claim for chemical restraint. However, the Court agrees with Claassens about the pleadings' failure to state a claim for telephone calls or a copy of rights. Accordingly, those claims with respect to Claassens will be dismissed without prejudice.

As an initial matter, the Court acknowledges that in the more than 20 years that the Patient's Rights Act has been in force, the executive branch has failed to promulgate any grievance procedures pursuant to 3 CMC § 2564. (*See* Opp'n to Claassens 12.) To the extent that Claassens seeks to shield himself from liability for Christian's failure to exhaust administrative remedies that do not exist, that argument is frivolous, and is rejected. (Claassens Mot. 14.)

*Physical and Chemical Restraint*. As stated above for Count 3, the pleadings adequately allege that the Commonwealth and Claassens violated the Patient's Rights Act by chemically restraining Christian. *See* 3 CMC § 2558(a). Defendants may raise the emergency exception as an affirmative defense, but it is not Christian's obligation to plead an absence of emergency.

*Telephone Access*. The Complaint does not provide sufficient facts to show that the Commonwealth or Claassens violated Christian's right to a telephone. As the Court stated above for Count 4, the Patient's Rights Act provides that a patient has the right to "have ready access to a telephone, both to make and receive calls in privacy." 3 CMC § 2556(a)(3). The Complaint alleges that "Claassens and Does 1–10 denied plaintiff ready access to a telephone." (Compl. ¶ 40.) That conclusory statement—akin to a blanket claim that Defendants broke the law—cannot

support a violation of Christian's right to access a telephone. *See Twombly*, 550 U.S. at 555–56. Instead, Christian must provide facts to show that Defendants' actions deprived her of the right.

*Copy of Rights*. The Complaint fails to state a claim for Claassens' alleged failure to provide Christian with a copy of her rights because it does not allege, and the statute does not create, an affirmative duty requiring Claassens to provide such notice. However, the Complaint successfully states a claim against the Commonwealth. Christian alleges that Claassens and the Commonwealth are liable under the Patient's Rights Act for failing to provide her with a copy of all the rights she was entitled to during her stay. (Compl. 49.) The Patient's Rights Act requires that "[p]ersons, upon admission, must receive a copy of all the rights they are entitled to during their stay in the evaluation or treatment facility." 3 CMC § 2560. However, the statute does not make any particular person responsible for providing a patient with a copy of his rights, and the pleadings are silent on the question of duty. Accordingly, the Complaint fails to state a claim with respect to Claassens or Does 1–10 because it does not appear that anyone in particular had a duty to act.

Accordingly, the provisions of Count 12 alleging that Claassens violated Christian's rights to telephone access and to a copy of her rights are dismissed without prejudice.

*Count 13:   Negligence*

In Count 13, Christian alleges that the Commonwealth, CHC, Muna, Deleon Guerrero, and Does 1–10 were negligent in failing to train their employees.[17] (Compl. ¶¶ 137–43.) Count 13 reads:

> 137.    The plaintiff re-alleges paragraphs 1 through 136 as if fully set forth herein.
>
> 138.    Plaintiff has a legally protected interest in her personal safety, security and bodily well-being.

---

[17] Christian dismissed Manglona and Claassens at the October 2014 hearing.

139.   Defendants owed a duty of care to plaintiff not to unreasonably cause physical injury to plaintiff or to enter her premises illegally.

140.   Defendants breached their duty of care to plaintiff by failing to train and supervise police officers and health care personnel in the treatment of persons with mental illness.

141.   The conduct of defendants fell below the standard of conduct a reasonable person under like circumstances.

142.   Defendants' conduct was such that a reasonable person should recognize as involving an unreasonable risk of injury to plaintiff.

143.   Defendants' breach of the duty of care they owed plaintiff was the cause of injury to plaintiff.

(Compl. ¶¶ 137–43.) Because Count 13 fails to provide any allegation other than a "formulaic recitation of the elements" of common law negligence, it must be dismissed without prejudice. *Twombly*, 550 U.S. at 555.

Count 13 is factually underdeveloped. Unlike Christian's other claims, which at least attempt to allege particular conduct giving rise to liability, Count 13 fails to allege any facts to support a negligence claim. It does not identify specific Defendants. It does not identify negligent conduct. It does not describe an injury. It is empty of content, despite having already been amended once.

This Court grants leave to amend freely in the interests of justice, but there are limits. *See* Fed. R. Civ. P. 15(a)(2). For instance, the interests of justice do not countenance "undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, [or] undue prejudice to the opposing party." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989). Here, counsel for Christian amended Count 13 once already, but did nothing more than allege a failure to train in the amended paragraph 140. (*See* Initial Compl. ¶ 85, ECF No. 1; Compl. ¶ 140.) Even if the inadequacy of Count 13 was not obvious, the Commonwealth's motion to dismiss the initial complaint identified the same lack of factual content that the Court identifies

46

now. (*See* Mot. 22, ECF No. 9.)

Count 13 is dismissed without prejudice. The Court grants leave to amend, but further failures to provide factual content will not be tolerated.

## VI.   MOTION FOR A MORE DEFINITE STATEMENT

The Commonwealth also moves for a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure. (Commonwealth Mot. 20–23.) The Court will grant the motion and order Christian to comply with the following instructions for her next set of pleadings.

As the Court's foregoing analysis has made clear, the pleadings are not the model of clarity that they could be. (*See* Commonwealth Mot. 20–23.) In some cases, that lack of clarity is merely inconvenient (e.g., Count 12), but in others it thwarted the Court's attempt at review and required dismissal (e.g., Count 6).

Before filing the amended pleadings, Christian's attorneys must ask themselves whether the Court could dismiss any cause of action in the complaint in part rather than in whole (aside from dismissing a particular defendant). If the Court could dismiss part of a count, then it should probably be broken up. *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded upon a separate transaction or occurrence . . . must be stated in a separate count").

For instance, to the extent that Count 1 included both an unreasonable-seizure claim and an excessive-force claim, it was really two causes of action combined. The first part asked whether Defendants had probable cause to seize Christian; the second part asked whether Manglona's use of force was reasonable. Applying Rule 10(b)'s guiding principle, Christian should have pleaded excessive force as a separate claim. *See* Fed. R. Civ. P. 10(b).

The Commonwealth's motion for a more definite statement is granted, and Christian is instructed to amend her pleadings in accordance with the Court's instructions.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## VII.   CONCLUSION

The chart below provides a summary of what was dismissed and whether the dismissal was with or without prejudice.

| Cause of Action | Defendants | Relief Sought | Result |
|---|---|---|---|
| 1. Unreasonable seizure in violation of the Fourth and Fourteenth Amendments: 42 U.S.C. § 1983 | Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment | Excessive force claim dismissed without prejudice |
| 2. Deprivation of a liberty interest created by CNMI's Involuntary Civil Commitment Act in violation of Fourteenth Amendment due process: 42 U.S.C. § 1983 | Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment | Dismissed without prejudice |
| 3. Deprivation of a liberty interest in freedom from physical and chemical restraint created by CNMI's Patient's Rights Act in violation of Fourteenth Amendment due process: 42 U.S.C. § 1983 | Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment | Physical restraint claim dismissed without prejudice |
| 4. Deprivation of a liberty interest in access to a telephone created by CNMI's Patient's Rights Act in violation of Fourteenth Amendment due process and the First Amendment: 42 U.S.C. § 1983 | Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment | Dismissed without prejudice |
| 5: Deprivation of liberty in violation of the Fourteenth Amendment based on a failure to train: 42 U.S.C. § 1983 | Esther L. Muna (official capacity) James C. Deleon Guerrero (official capacity) | Injunctive Relief Declaratory Judgment | Dismissed without prejudice |
| 6. Unlawful discrimination in violation of the Americans with Disabilities Act: 42 U.S.C. § 12132: 42 U.S.C. § 1983 | Commonwealth CHC Muna (official capacity) Deleon Guererro (official capacity) Manglona (both capacities) Claassens (both capacities) | Declaratory Judgment Damages (Manglona and Claassens only) | Dismissed without prejudice |

| Cause of Action | Defendants | Relief Sought | Result |
|---|---|---|---|
| 7. Breach of Settlement Agreement | Commonwealth CHC Claassens | Damages Injunctive Relief | Claassens dismissed with prejudice |
| 8. Unreasonable seizure in violation of Article I, §§ 3 & 5 of the Commonwealth Constitution | Commonwealth CHC Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment | Manglona, Claassens, and Does 1-10 individual capacity claim dismissed with prejudice; Article I, § 5 dismissed with prejudice |
| 9. Deprivation of liberty interest created by CNMI's Involuntary Civil Commitment Act without due process in violation of Article I, § 5 of the Commonwealth Constitution | Commonwealth CHC Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment | Dismissed without prejudice |
| 10. Deprivation of liberty interest in freedom from physical and chemical restraint created by CNMI's Patient's Rights Act in violation of Article I, § 5 of the Commonwealth Constitution | Commonwealth CHC Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities)) | Damages (Compensatory and Punitive) Declaratory Judgment | Dismissed without prejudice |
| 11. Deprivation of right to telephone access as established by CNMI's Patient's Rights Act in violation of Article I, §§ 2 & 5 of the Commonwealth Constitution | Commonwealth CHC Manglona (both capacities) Claassens (both capacities) Does 1–10 (both capacities) | Damages (Compensatory and Punitive) Declaratory Judgment | Dismissed without prejudice |
| 12. Violation of Patient's Rights Act for failure to provide a copy of rights | Commonwealth CHC Claassens Does 1–10 | Declaratory Judgment | Claassens dismissed without prejudice |
| 13. Negligence | Unspecified Defendants | Unspecified | Dismissed without prejudice |

The motions to dismiss (ECF Nos. 13, 14, & 15) are granted in part and denied in part, and

the motion for a more definite statement (ECF No. 14) is granted.

Christian's Second Amended Complaint shall be filed **no later than May 11, 2015**.

SO ORDERED this 24rd day of April, 2015.

_____
RAMONA V. MANGLONA
Chief Judge